FILED

2012 Mar-30  PM 03:16
U.S. DISTRICT COURT
N.D. OF ALABAMA



## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

| | |
|---|---|
| **LIBERTY MUTUAL FIRE** ) | |
| **INSURANCE COMPANY, a/s/o** ) | |
| **VIRGINIA HUNNICUTT,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **CASE NO. 7:09-cv-1702-SLB** |
| ) | |
| **GEORGE HUNNICUTT; TERRI** ) | |
| **HUNNICUTT,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION

This case is before the court on Defendants' Second Motion for Summary Judgment. (Doc. 54.)[1] Liberty Mutual Fire Insurance Company ("Liberty Mutual"), as subrogee of its insured, Virginia Hunnicutt, brought suit to recover benefits paid on Ms. Hunnicutt's claim of total loss of a residential home due to fire. In the Complaint, plaintiff asserted claims based on negligence and negligence per se. (Doc. 1.) The court previously granted summary judgment to defendants on the negligence per se claim, but denied summary judgment on the negligence claim. (Doc. 76.) In their Second Motion for Summary Judgment, defendants now move the court for summary judgment on the remaining negligence count. Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the

---

[1] Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

relevant law, the court is of the opinion that defendants' Second Motion for Summary Judgment, (doc. 54), is due to be denied.

## I. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met its burden, the non-moving party must go beyond the pleadings and show that there is a genuine issue of fact for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1); *see also Clark*, 929 F.2d at 608 ("[I]t is never enough simply to state that the non-moving party cannot meet its burden at trial.").

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "[C]ourts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam)). Nevertheless, the non-moving party "need not be given the benefit of every inference but only of every reasonable inference." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999) (citing *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)); *see also Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

## II.  STATEMENT OF FACTS[2]

Plaintiff, Liberty Mutual, brought this subrogation action to recover losses suffered as the result of a fire that totally destroyed a home owned by its insured, Virginia Hunnicutt, on or about August 1, 2008.  (Doc. 1 ¶¶ 6-9, 12.)  Virginia insured the home with Liberty Mutual, who paid for Virginia's loss and damage pursuant to her policy's terms and

---

[2]As required when evaluating a motion for summary judgment, the court states the facts and all reasonable inferences arising from them in the light most favorable to plaintiff, the nonmoving party. *See, e.g.*, *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970) (citations omitted)).

conditions.  (*Id.* ¶ 11; doc. 57-1 at 1-9.)  Virginia's son George, daughter-in-law Terri, and granddaughter resided at the insured property, located at 15602 Butler Ridge Road in Cottondale, Alabama, at the time of the fire.  (Doc. 36 at 16, 34-36; doc. 35 at 8, 18, 84.) Plaintiff claims that the fire was caused by defendants' leaving the cooking range on and unattended.  (Doc. 1 ¶ 10.)

Early in the morning of August 1, 2008, Terri Hunnicutt cooked bacon and eggs for her husband using one frying pan on their electric cooking range on the stove top.  (Doc. 36 at 37-38; doc. 35 at 83.)  George then left for work, and Terri and their daughter left the house around 11 a.m.  (Doc. 36 at 38-39.)  Terri and her daughter returned around 3 or 4 p.m., and then Terri took her daughter to a friend's house to spend the night.  (Doc. 36 at 36, 39.)  George returned from work around 6 p.m.  (*Id.* at 39-40; doc. 35 at 79.)  Around 8 or 9 p.m., Terri and George left their house and went out to dinner.  (Doc. 35 at 79-80; doc. 36 at 40-41.)  Around 12:30 a.m. on August 2, Virginia, who lived on the same street as George and Terri, called George and Terri to tell them that their house was on fire.  (Doc. 57-5 at 2; doc. 36 at 54; doc. 35 at 20, 78-80, 92-93.)

No one used the stove after breakfast on the morning of August 1.  (Doc. 36 at 39; doc. 35 at 82, 100.)  George cooks very rarely, and the Hunnicutts' daughter was too young to use the cooktop range in August 2008, although she occasionally used the microwave. (Doc. 36 at 68-69.)  Terri and George testified that Terri has a normal practice of leaving the frying pan on the stove top after using it, specifically on the back right rear element of the

range, instead of putting it back in the cabinet.  (Doc. 36 at 70; doc. 35 at 101.)  George testified that the frying pan was left on the range the day of the fire.  (Doc. 35 at 101.)  Terri testified that she has never left the oven or range on when she was not in the house, and George testified that he has never left the range on and unattended.  (Doc. 36 at 67; doc. 35 at 100.)

In her deposition, Terri initially described two ways by which she could tell that one of the elements on the stove/range top had been left on: the stove would emit a certain smell and a stove top indicator light would be illuminated.  (Doc. 36 at 41-42, 47-48, 50.)  She further stated that, because the indicator light was bright enough for her to see it glowing when it was illuminated, she believes she would have noticed if it was on when she walked past the kitchen to her daughter's bedroom on the afternoon of August 1, 2008.  (*Id.* at 41-42.)  The indicator light faced upward from the flat stove top.  (*Id.* at 48.)  Terri later admitted in her deposition that the smell she associated with an element being on was actually something she smelled when the oven was on, not the stove/range top.  (*Id.* at 65.)

Four experts were retained in the course of this litigation.  First, Liberty Mutual and the Hunnicutts' rental insurer, State Farm,[3] jointly retained Certified Fire Investigator Alec Conner to conduct a cause and origin investigation.  (Doc. 57-5 at 1; doc. 59-4 at 11, 15-16;

---

[3] While "it is undisputed that there is no rental agreement in place between Virginia Hunnicutt and Terrie and George Hunnicutt," (Doc. 75 at 17), the defendants did take out a rental insurance policy from State Farm.  (Doc. 35 at 66; doc. 36 at 29-31.)

doc. 59-5 at 78; doc. 60-1 at 133.)[4]  As a result of his investigation, conducted on August 6, 2008, Conner concluded that the fire originated in the kitchen near the right rear element of the Hunnicutts' stove/range top, although he could not tell whether that element's knob was in the "on" position when the fire started.  (Doc. 59-4 at 50, 62-63; doc. 59-5 at 78; doc. 57-5 at 1.)  Because the control panel containing the knobs for each of the range's elements was completely destroyed in the fire, none of the experts could definitively say whether the fire was caused by an element being left on.  (Doc. 59-4 at 62-63; doc. 64-1 at 60, 62-63; doc. 66-4 at 68-69, 73.)  Conner did not find evidence indicating that the fire had been started intentionally, and also concluded that the fire did not originate in the microwave, which was situated above the cooking range, or in the home's HVAC system.  (Doc. 59-4 at 44, 52, 62, 64; doc. 59-5 at 111.)  Conner also examined the cord that plugged the range into the wall and found "no significant arcing."  (Doc. 59-4 at 51.)  The wall outlet had signs of melting and heat damage but was "still fairly much intact."  (*Id.*)

Conner's report states that the bottom side of the stove's glass top had high temperature discoloration that radiated from the right rear heating element.  (Doc. 57-5 at 2.)  He found an aluminum or metal pan or pot melted onto the right rear element of the stove's glass top.  (*Id.* at 2; doc. 59-4 at 35.)  Conner concluded that, based on how the pan melted,

---

[4]At the time of his investigation, Conner worked for his own company, AC Fire Investigations.  (Doc. 59-4 at 12-13.)  However, Liberty Mutual provided over half of his business, and by the time of Conner's deposition, Conner worked for Liberty Mutual.  (*Id.* at 12-14.)

the heat source came from the location of the pot, although he could not tell whether the heat source was underneath the pot or was inside it.  (Doc. 59-4 at 65.)

At his deposition, Conner compared the evidence of the Hunnicutts' fire to another fire he had investigated which was admitted by the homeowner to have been the result of having left a pot burning on the right rear element of the stove.  (Doc. 59-5 at 67, 73.)  The stove in that case was also a glass top stove "that had the glass top and the heating elements underneath the glass," just as the Hunnicutts' stove did.  (*Id.* at 67.)  Conner testified that the fire patterns on that stove's glass top, on the back of the stove, on the surrounding metal, and on the heating element controls were "generally the same" as the fire patterns on the Hunnicutts' stove.  (*Id.* at 68.)  He testified that the burn patterns on both of the stoves' glass tops were "almost identical," both having "more discoloration around that right rear element than [they] did anywhere else on the glass."  (*Id.* at 70.)  When asked in his deposition whether, based on his origin and cause determination, he was suggesting that the Hunnicutts left the stove on and caused the fire, Conner answered, "No, sir.  I don't know that they left it on.  I know that the evidence is that there's a significant amount of damage to the right rear."  (*Id.* at 127.)  Conner stated that the higher amount of fire and heat damage around the right rear heating element "led [him] to believe that something occurred on the right rear area of the stove where [he] found the melted pot.  The evidence was very clear that something occurred in that area."  (Doc. 59-4 at 49.)

7

After Conner's initial investigation, State Farm hired licensed engineer Jeff Hadley of Forensic Analysis and Engineering Corporation ("FAEC") to conduct an examination. (Doc. 64-1 at 10-11, 21-22.) On August 29, 2008, Conner and Hadley met at the location of the storage facility where the remains of the microwave and stove were being stored. (Doc. 64-2 at 1-2.) The two experts met again in November 2008 to examine the remains of the microwave and stove. (*Id.*) Hadley did not independently make a determination as to origin or investigate other appliances as potential sources of the fire, and instead worked off of Conner's conclusion that the fire originated in the kitchen. (Doc. 64-1 at 16-17.)

Based on his examination, Hadley was unable to provide a cause determination but confirmed Conner's conclusions that "the fire damages were more pronounced on the right rear side of the stove and bottom right of the microwave and both units indicated the fire spread to the left." (Doc. 64-2 at 2-3.) His report notes a finding of "no observable evidence of electrical arching and malfunction," and that "[a]ll of the electrical and electronic components were severely damaged and/or destroyed by the fire." (Doc. 64-2 at 3.) FAEC also conducted a metallurgical examination of the pot to attempt to determine "if there was exposure of specific heat greater than another region" and to determine "which way the fire was moving, up, down, left, [or] right," but the results of the testing were inconclusive. (Doc. 64-1 at 48-49.)

At his deposition, Hadley testified that he was unable to determine whether or not the microwave was a potential cause of the fire and also could not determine whether the fire

was caused by the cooking range being left on.  (*Id.* at 59, 63-64.)  When asked whether, based on the evidence, it was possible that the fire originated from the range being left on, Hadley answered, "Anything is possible.  I don't have information to draw that conclusion." (*Id.* at 71.)  Hadley did not reach a conclusion as to what caused the fire.  He stated, "I can't answer if it wasn't something above.  That there was grease in a pot that something fell down into, an electric bulb that popped and set that up.  I can't answer those questions." (*Id.* at 55.)

Liberty Mutual hired a third investigator, John Parsley of Unified Investigations & Sciences, Inc., who accompanied Conner and Hadley on the August 29, 2008 investigation. (Doc. 64-2 at 1-2; doc. 42 ¶¶ 1-3.)  Parsley also was present at the November 2008 investigation at the storage facility.  (Doc. 64-2 at 2; doc. 42 ¶ 4.)  Parsley drafted a report in which he concluded that either the contents of an aluminum pan or the pan itself ignited as a result of the right rear element being left in the "on" position, causing the fire that destroyed the Hunnicutts' home.  (Doc. 31-3 at 5.)  However, Parsley failed to appear at his deposition, ignored a subpoena to produce his file, and plaintiff subsequently withdrew him as a designated expert.[5]  (Doc. 42 ¶¶ 9-11; docs. 46 & 47.)

---

[5]

  Although Parsley's report is in the record, because he has been withdrawn as a designated expert by plaintiff and has not been deposed, his report will not be relied upon in deciding summary judgment.  *See Jones v. City of Columbus, Ga.*, 120 F.3d 248, 253 (11th Cir. 1997) (holding that district court abused its discretion in deciding a summary judgment motion where defendant offered affidavit in support of summary judgment but plaintiffs had not had adequate opportunity to depose the affiants).

Liberty Mutual then hired a fourth expert, electrical forensic engineer David Leone of SEA, Ltd., to prepare a report after examining the range and microwave. (Doc. 69-1; doc. 66-2 at 5.) In July 2010, Conner and Leone conducted an investigation at the storage facility housing the remains of the Hunnicutts' range/oven and microwave. (Doc. 69-1 at 4.) Leone examined the remaining wiring and safety controls for the range top heating elements and found no evidence of any product defect or malfunction. (*Id.* at 3.) Leone's examination of the microwave was inconclusive. Because the fire consumed the control panel as well as most of the main component parts of the microwave, he could not determine whether the microwave was off or on at the time of the fire. (Doc. 66-2 at 9-10.) Although some of the microwave controls were missing, he stated, "For the two components that were there, the power transformer and the main blower motor, I could make a conclusion that there was no electrical failure in those two devices." (*Id.* at 10.) The power transformer is one of the main heat producing devices in the microwave, and Leone found it to be intact and in "very good condition." (*Id.* at 15.) Leone found no evidence, in the form of either oxidation or burn patterns, of fire in the oven cavity of the stove and also did not find any evidence of fire inside the microwave. (*Id.* at 11-12, 24-25.) Leone could not tell whether the oven was on or off at the time of the fire but concluded that the fire did not start in the oven. (Doc. 66-4 at 61.) He testified that he did not independently draw a conclusion about the origin of the fire but stated, "I read Mr. Conner's report, and I read Mr. Hadley's report, and both of them put the origin on that [right rear burner] area of the stove. I have no reason to disbelieve either

one of them.  What I saw, at least the remaining evidence I saw, is consistent with that . . .

."  (*Id.* at 59-60.)

Leone examined the range's high limit safety thermostats, located at each of the elements, which are "designed to open up the circuit and turn the element off" if "there's a failure in the system that would leave [an] element on."  (*Id.* at 72.)  Leone found that three of the range's four thermostats–all of them except the one for the left front element–had annealed, a process by which the safety thermostat contact opens to limit the temperature the burner reaches.  (*Id.* at 73.)  He testified that it was "very unusual" to find just one of the four thermostats different than the rest.  (*Id.* at 81.)  Leone testified that "having the left front one not triggered, or not annealed, and the other three annealed is an observation that is consistent with more heat for a longer period of time to the right rear."  (*Id.* at 79.)  He stated, "It's a fairly clear indicator that there's more heat to the right rear, or possibly that something was blocking that left front burner specifically to keep it cool.  Those are the two possibilities."  (*Id.* at 77.)  He rejected the possibility that the front left element could have been protected by a piece of broken glass, because, at least when he examined the stove, the glass was broken more over the left front burner than the other three burners, causing the front left burner to be the least protected.  (*Id.* at 77-78.)

Leone testified in his deposition that he formed an opinion as to the cause of the fire "[b]ased on Mr. Hadley's information, Mr. Conner's and my examination of the artifacts," but did not include his opinion of causation in his report because "the range top controls were

11

completely consumed, so I really can't tell you whether they were on or off." (*Id.* at 68-69.) Therefore, in his professional opinion, he could not conclude whether a burner was left on "within a reasonable degree of scientific certainty." (*Id.* at 69, 73.)  However, when asked his personal opinion of what caused the fire, he answered,

> Based on what Mr. Hadley saw, based on what Mr. Conner saw, based on my -- what I saw, specifically that localized burn pattern on the control panel, based on the evaluation of the safety devices that were integral with the burners, and based on my experience with the controls that are used in this particular oven, everything that I'm seeing and reading points to a typical cook top fire. I'd have to . . . conclude that that's the probable cause of the fire, a cook top fire that one of the controls was probably left on.

(*Id.* at 71-72.)  He later reiterated that he could not come to any other conclusion "based on everything [he had] read and seen and examined." (*Id.* at 74.)  He also stated that the aluminum pot that was found "melted and adhered to the right rear burner" was also an "important indicator" to him of a cooktop fire.  (*Id.*)

## III.  DISCUSSION

Plaintiff claims that defendants acted negligently by leaving the cooking range on and unattended, causing the fire which destroyed Virginia Hunnicutt's home. (Doc. 1 ¶¶ 10, 13-16.)  Specifically, plaintiff claims that defendants owed a duty to plaintiff "to exercise reasonable care in maintaining the residence and to avoid harm or damage to persons and/or property," and that defendants breached this duty by "failing to exercise reasonable care in maintaining the property; failing to take adequate and necessary precautions to prevent a fire from originating from the appliances in the residence; failing to properly and adequately

supervise the food or items that they were preparing on an appliance in the residence; failing to keep the premises safe; failing to use the appliance in a reasonable manner; and such other and further negligent acts and omissions . . . . " (*Id.* ¶¶ 14-15.)

Under Alabama law, the elements of a negligence claim are 1) duty, 2) breach of duty, 3) proximate cause, and 4) injury. *Spain v. Brown & Williamson Tobacco Corp.*, 872 So. 2d 101, 134 (Ala. 2003) (per curiam) (citing *Yamaha Motor Co., Ltd. v. Thornton*, 579 So. 2d 619, 623 (Ala. 1991)). The only disputed issue here is causation. "A plaintiff must establish the existence of a nexus between the action of the defendant and the subsequent injury or damage sustained by the plaintiff. Where the plaintiff fails to show that the action of the defendant 'proximately caused' his injury or damage, then an action for negligence cannot be sustained as a matter of law." *Bell v. Colony Apartments Co.*, 568 So. 2d 805, 807 (Ala. 1990).

Alabama courts recognize that "summary judgment is rarely appropriate in negligence actions, which almost always present factual issues of causation." *Ex parte Mobile Power & Light Co.*, 810 So. 2d 756, 759 (Ala. 2001) (internal quotation marks and citation omitted). "'[I]f there is evidence which points to any one theory of causation, indicating a logical sequence of cause and effect, then there is a judicial basis for such a determination, notwithstanding the existence of other plausible theories with or without support in the evidence.'" *Dixon v. Bd. of Water & Sewer Comm'rs*, 865 So. 2d 1161, 1166 (Ala. 2003) (quoting *Griffin Lumber Co. v. Harper*, 25 So. 2d 505, 509 (Ala. 1946)). "There may be two

or more plausible explanations as to why an event happened or what produced it; yet, if the evidence is without selective application to any one of them, they remain conjectures only." *Griffin Lumber Co.*, 25 So. 2d at 509. "Findings of facts cannot be based upon mere conjecture," but "direct evidence is not necessary to prove negligence on the part of a defendant and [] proof of negligence may be established completely through circumstantial evidence." *Bell*, 568 So. 2d at 810. Negligence "may be inferred by a jury from the circumstances out of which the injury arose." *Id.* (citation omitted). "A fact is established by circumstantial evidence if it can be reasonably inferred from the facts and circumstances adduced." *Id.* at 810-11 (citations omitted); *see also Dixon*, 865 So. 2d at 1166 ("a theory of causation is not mere conjecture, when it is deducible as a reasonable inference from known facts or conditions") (internal quotation marks and citations omitted).

Defendants claim that "Plaintiff's expert testimony is too vague or incomplete to provide sufficient evidence of the exact cause of the fire." (Doc. 55 at 20.) Defendants emphasize that "no expert has concluded that a range burner was left on, and no expert has opined that any of the Hunnicutts' actions caused the fire." (*Id.* at 17.) Plaintiff responds that the circumstantial evidence, along with the experts' elimination of other possible causes, leads to the conclusion that the fire was caused by the burner being left on by the defendants. (Doc. 73 at 13, 16-17.)

Where the exact cause of a fire is unknown, but expert testimony points to a likely cause and origin of the fire, courts have held that a genuine issue of material fact as to

14

causation exists so as to preclude summary judgment.  *See Bell*, 568 So. 2d at 811; *AGF Marine Aviation Transp. v. LaForce Shipyard, Inc.*, 2006 WL 2402345, at *4-5, *7  (S.D. Ala. Aug. 18, 2006) (denying summary judgment on plaintiff-subrogee's negligence claim against ship builder arising out of a fire that destroyed the ship where, although the expert testimony was inconclusive as to the exact cause of the fire, plaintiff's experts agreed that fire originated in wheel house where the circuit breaker was located).

In *Bell*, tenants of an apartment complex sued the owner of the apartments alleging that defendant's employees negligently performed repairs on the heating system in one plaintiff's apartment, causing damage to her and other tenants' apartments, and that defendant breached its leases with the plaintiffs by failing to maintain the apartment complex and its equipment in a safe and working order.  568 So. 2d at 806.  Responding to a complaint made by one of the tenants about her heating system, two employees of the apartment complex performed work on a transformer relay and a fan motor located inside the apartment's furnace and also worked on her thermostat.  *Id.*  Soon after the employees left the apartment, a fire broke out in the crawl space located between the ceiling of the apartment they had worked on and the floor of the apartment immediately above it.  *Id.* Plaintiffs had no direct evidence of causation, although the fire investigation experts agreed that a probable cause of the fire was something electrical.  *Id.*  One expert testified that he did not know what actually started the fire, but based on burn patterns and his experience, he concluded that it started as an electrical fire in the crawl space.  *Id.* at 807.  Another expert

testified that he could not "definitely" say that the work of the maintenance man caused the fire, but that it was a "probability." *Id.* at 808.  He could not give an opinion as to the "probable exact cause," but that "as an opinion," he felt that something the maintenance man did with the electrical wires contributed to the fire. *Id.*  A third expert, an electrical inspector, testified that, although he could not definitely say that the cause of the fire was an electrical malfunction and he could not identify the particular malfunction that caused the fire, "[t]he only thing that we found in that area up there that would be a probable cause was the electrical.  That's the only thing we found in there." *Id.* at 809.

The *Bell* defendants moved for summary judgment, arguing that there was no genuine issue of material fact as to the proximate cause of the apartment fire, and the trial court granted the motion. *Id.*  However, the Alabama Supreme Court reversed, finding sufficient circumstantial evidence of causation. *Id.* at 810-11.  The court stated that the evidence showed that the fire was of an electrical origin and that it originated in a place where the defendant's employee had been making electrical repairs within thirty minutes of the discovery of the fire. *Id.* at 810.  The court stated, "Although the plaintiffs' experts testified that they could not definitely state that the defendant's employee caused the fire, a definite statement of that nature is not necessary to defeat a motion for summary judgment." *Id.*  However, the court stated, "if there had been no evidence presented concerning the origin of the fire, the probable cause of the fire, and the other circumstances surrounding the fire,

16

then summary judgment might have been appropriate." *Id.* at 809.  Accordingly, the court found it was error to grant summary judgment on the negligence claim.  *Id.* at 811.

In contrast, where no direct or circumstantial evidence of causation or origin is presented, and the only evidence as to causation is a plaintiff's unsubstantiated speculations, summary judgment is warranted. *See Hollis*, 547 So. 2d at 873; *Massey v. Mohammed Khansari Atigh, Inc.*, 669 So. 2d 875, 877 (Ala. 1995).  In *Hollis*, plaintiffs claimed that defendants negligently and intentionally caused the fire which burned their building.  547 So. 2d at 872.  The parties disputed whether the fire started in defendants' building and spread to the plaintiffs' building or vice versa.  *Id.*  Despite investigations by the fire department, an insurance company, and a deputy state fire marshal, neither the cause nor exact location of the fire's origin was determined.  *Id.* at 873.  The plaintiffs claimed that the defendants negligently maintained the wiring in their building, but no evidence was offered to show that the fire was caused by the wiring or any other possible defect in the building.  *Id.*  The court stated,

> All that the Hollises produced against the [defendants] were the Hollises' own depositions, wherein they claimed that the wiring was faulty and was the cause of the fire, even though they were not experts and *they had never been in the [defendants'] building*.  Such speculation or conjecture is wholly insufficient to warrant submission of the case to a jury.

*Id.* (citation omitted).  Accordingly, the court affirmed the trial court's grant of summary judgment in favor of defendants.  *Id.*

Similarly, in *Massey*, the court affirmed the trial court's grant of summary judgment in favor of defendant on plaintiff's negligence claim where the only evidence presented as to negligence was plaintiff's speculative allegations that defendant negligently maintained the building.  669 So. 2d at 876-77.  Plaintiff, the lessee of adjacent property to defendant's building, sued to recover for damages sustained to his property as a result of a fire in defendant's building.  *Id.* at 875.  The day before the fire, defendant had electrical work performed on the building, including some work on a neon sign on the chimney of the building.  *Id.* at 876.  The evidence showed that the fire started in the attic of defendant's building, but "there was no evidence that the fire started in the immediate area where the work had been done or that the fire was caused by the work."  *Id.*  The plaintiff testified that the basis of his claim that defendant negligently maintained the building was plaintiff's observation that the interior of defendant's building was a dirty "greasy spoon" restaurant, and he had "no idea" about what defendant did or didn't do that caused the fire.  *Id.*  The court found that plaintiff had presented "no circumstantial evidence regarding the origin of the fire" and, accordingly, affirmed summary judgment under *Hollis*.  *Id.* at 877.

The evidence of causation in this case is more like the evidence presented in *Bell* than in *Hollis* or *Massey*.  Unlike *Hollis* and *Massey*, where the courts found "no evidence" of causation or origin aside from the plaintiffs' allegations, considerable circumstantial evidence exists here to show that the fire was caused by a burner that had been left on.  There was no evidence that the fire was started intentionally.  Conner concluded that the fire

originated on the right rear burner of the stove top, and Leone found the evidence to be consistent with that conclusion.  It is undisputed that the defendants used the stove top the morning before the fire erupted, although the evidence does not indicate which burner was used. Conner concluded that the fire did not originate in the microwave or in the home's HVAC system, and neither he nor Hadley found evidence of electrical arcing or malfunction. Leone ruled out an electrical defect in the microwave as the cause of the fire and ruled out the fire having started in the oven.  A melted pot or pan was found on the right rear burner, and Conner concluded that the fire source was either inside the pot or below the pot.  Further, Conner testified that the burn patterns of the defendants' stove were "almost identical" to another fire he had investigated where it was undisputed that the fire started as a result of a pot having been left on the right rear burner and the burner being left on, and the stove tops in both cases were glass tops with heating elements underneath.  Finally, Leone presented evidence of the annealing of the heating elements' thermostats which indicated that the right rear had burned the strongest for the longest period of time.  All of this evidence shows that plaintiff's theory of the case is more than mere "speculation or conjecture." *Hollis*, 547 So. 2d at 873.  Although no expert could definitively give a conclusion as to the cause of the fire,  "a definite statement of that nature is not necessary to defeat a motion for summary judgment."[6] *Bell*, 568 So. 2d at 810.

---

[6]

In deposition testimony, Leone gave his "personal opinion" that the fire was caused by a burner being left on.  However, he could not render this opinion "within a reasonable degree of scientific certainty."  (Doc. 66-4 at 69, 73.)  The court questions whether Leone's opinion as to causation is

Although the temporal proximity between the defendants' actions and the time of the fire is much longer here than in *Bell*, where the fire occurred thirty minutes after the repairs were done, the other circumstantial evidence is sufficient to preclude summary judgment. The defendants' testimony that the cooking range was not left on or used after Terri cooked breakfast directly contradicts the expert testimony pointing to a likely cooktop fire, raising a genuine issue of material fact that precludes summary judgment. *See Dixon*, 865 So. 2d at 1166-67 ("Dixon's testimony directly contradicts the Board's theory of causation. . . . . It is peculiarly the function of the jury to resolve such conflicts in the evidence as exist in this case."). The control knobs for the stove top were destroyed by the fire and therefore prevented the experts from conclusively saying that the fire was caused by a burner being left on. In fire cases, however, direct evidence will often not exist to point to a definitive cause, as the nature of a fire is that it consumes what would otherwise be evidence. *See Hartley v. St. Paul Fire & Marine Ins. Co.*, 118 F. App'x 914, 919 (6th Cir. 2004) ("[B]y the very nature of a fire, its cause must often be proven through a combination of common sense, circumstantial evidence, and expert testimony.") (internal quotation marks and citations omitted).

At oral argument, defendant argued that unless other causes such as an electrical malfunction in the stove could be definitively ruled out, it would be mere speculation for a jury to conclude that the fire was caused by a burner being left on. The court disagrees.

---

admissible as expert testimony. Prior to trial, the court invites a motion in limine with supporting argument on this evidentiary issue.

20

Under Alabama law, evidence of causation in support of any one theory is sufficient to survive summary judgment, "*notwithstanding the existence of other plausible theories with or without support in the evidence*."  *Dixon*, 865 So. 2d at 1166 (emphasis added) (quoting *Griffin Lumber Co.*, 25 So. 2d at 509).  As in *Bell*, evidence that the Hunnicutts' burner was left on "can be reasonably inferred from the facts and circumstances adduced."  568 So. 2d at 811 (citations omitted).  Based on the fact that the Hunnicutts used the stove that morning to cook breakfast, that the Hunnicutts had a practice of leaving a frying pan on the rear right burner of the stove after cooking, that the burn patterns on their stove top mirrored the burn patterns on another stove where it was known that a burner was left on, and that expert testimony indicated that the fire originated on the right rear side of the range, a reasonable jury could infer that the Hunnicutts left the right rear burner on, causing the fire.  "Of course, a jury will be free to reject any or all of the evidence necessary to establish [plaintiff's] theory of the case.  That it may do so, however, is of no moment at this stage of these proceedings."  *Dixon*, 865 So. 2d at 1166.  Viewed in the light most favorable to the plaintiff, the circumstantial evidence presents a genuine issue of material fact regarding whether the Hunnicutts left the burner on.

## IV.  CONCLUSION

For the foregoing reasons, the court finds that defendants' Second Motion for Summary Judgment, (doc. 54), is due to be denied.  An Order denying defendants' Motion will be entered contemporaneously with this Memorandum Opinion.

**DONE**, this 30th day of March, 2012.


_Sharon Lovelace Blackburn_
SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE